ROGER A. STEWART
*vs.*
MAINE EMPLOYMENT SECURITY COMMISSION

Waldo. Opinion, July 31, 1956.

 

*William D. Hathaway,*
 for Maine Employment Security Commission.

*Christopher S. Roberts,* for employer.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, JJ. MURRAY, A. R. J. CLARKE, J., did not sit.

WEBBER, J. Until his death on January 3, 1951, H. Parker Frost conducted an automobile and garage business in Belfast under the name of Belfast Auto Sales Co. He held a Ford automobile dealer's franchise, dealt in new and used cars and operated a garage for automotive repairs and service. The Ford franchise automatically terminated upon the death of Mr. Frost and the new and used cars on hand were sent by the executrix to Bangor. The garage continued to be operated by the estate under the name of Belfast Auto Sales Co. until April 1, 1951 and for 13 weeks employed 8 or more employees. On April 1, 1951, the petitioner purchased from the estate the automotive parts and tools and began operations at the same location under his own name. For a period of 13 weeks the petitioner employed at least 8 employees, substantially all of whom had been employed by the Frost estate. The real estate, which included the garage, although owned by Mr. Frost in his

lifetime, seems to have passed by will to his widow and by her was rented to the petitioner under a one-year lease. In addition to the new and used cars, the estate retained all accounts and notes receivable, cash on hand, and good will. At the time of Mr. Frost's death the entire business assets were valued at $83,805.86. The parts and tools were purchased by the petitioner for $19,750. Apart from unsupported assumptions and conjectures, the record is silent as to what portion of the retained assets, if any, may have been liquidated by the estate prior to April 1, 1951. The building was carried on the books of Frost at $19,506.

Upon these facts the Maine Employment Security Commission determined that the employment experience of the petitioner should be tacked to the experience of the estate and that under the provisions of R. S., 1954, Chap. 29, Sec. 3, Subsection IX, Paragraph C, the petitioner should be charged with liability as an "employer." This decision was affirmed in the Superior Court and the case now comes up on exceptions.

Standing alone, both the estate and the petitioner fail to qualify as "employers" under the Act, neither having employed 8 or more persons in each of 20 different weeks as required by Paragraph A of the subsection. Paragraph C, however, reads as follows:

> "('Employer' means)
>
> C. Any individual or employing unit which acquired the organization, trade or business, or substantially all the assets thereof, of another employing unit not an employer subject to the provisions of this chapter and which, if subsequent to such acquisition it were treated as a single unit with such other employing unit, would be an employer under Paragraph A of this subsection;"

The issue presented is whether or not the petitioner did "acquire the organization, trade or business (of the estate),

or substantially all the assets thereof," it being undisputed that if he did so his employment experience coupled with that of the estate would make him an "employer" under the Act. The term "business" has many meanings which vary with and are ordinarily determined by the context. A "business" may own or lease real and personal property and possess a trade name, good will, cash resources and accounts and notes receivable. It may own valuable patents, copyrights, contracts or franchises. It may have an experienced manufacturing or sales force. The success of the "business" as a going concern may well depend upon the effective combination of some or all of these factors. We think that the Legislature in using the phrase, "acquire the organization, trade or business," contemplated a situation in which there is continuity of the enterprise relatively uninterrupted by the transfer of ownership. In our view, the legislative concept was one of succession to and continuation of a business, ordinarily as a going concern. Certainly upon these facts the entire "business" as it was constituted on April 1, 1951 was not "acquired" by the petitioner. He did not purchase or use the name, the good will, the cash or the accounts and notes receivable. As to the real estate, the leasehold interest which he acquired came not from the estate but from the third party owner. He did not take over or acquire employees under any arrangement with the estate, but hired them individually and independently. In the absence of so many of the usual incidents of the acquisition of an entire business, it is evident that the requisite element of continuity did not exist. In effect, the petitioner began a new enterprise.

Is the petitioner, however, chargeable as having acquired "substantially all the assets thereof"? Although the Commission in the case before us seems at first to have taken the position that the petitioner had acquired the entire business, "all the business that was left" on April 1, 1951, its

position as developed in its brief and argument now is that the petitioner acquired "substantially all of the assets" of the business as of the date of acquisition. With this contention we cannot agree. We have already listed the many assets of the business which the petitioner did *not* acquire. If we consider only physical assets and their inventory values, our starting point is an inventory of approximately $83,800 at the time of Frost's death. Real estate may be disregarded, not having passed into the estate. Subtracting the amount of approximately $19,500 as representing real estate, and further subtracting $19,750 as the amount paid by the petitioner for parts and tools, there yet remain assets unaccounted for in an amount of approximately $44,550. There is no suggestion in the record as to how this amount may be divided among new cars, used cars, accounts receivable, or other assets. Nor does the record disclose, as has been noted, to what extent, if at all, these assets had been liquidated at the time of petitioner's acquisition. Proof that one acquired "substantially all of the assets" of a business is not satisfied by mere conjecture or surmise as to what "all of the assets" consisted of at the time of acquisition. The petitioner disclaimed any knowledge whatsoever. The Commission failed to produce, or even to seek, the necessary information from the executrix or others who might reasonably be expected to possess it. For aught that appears to the contrary, the value of parts and tools purchased by the petitioner may have been less than a third of the value of the physical assets on hand on April 1, 1951. The required proof that what the petitioner bought in fact represented "substantially all of the assets" is completely lacking.

The research of counsel and our own fail to reveal many cases in which the interpretation of this statutory phraseology has been in issue. In *Harris* v. *Egan,* 135 Conn. 102, 60 A. (2nd) 922, where the buyer purchased from an "em-

ployer" as defined by the Act an entire business including good will, the seller retaining only his accounts receivable and payable, the court laid emphasis on the particular wording of the Connecticut statute. Unlike our own, this Act used the words "acquired substantially all of the assets, organization, trade or business." Under this wording and upon these facts, the court found no difficulty in holding that the buyer had "acquired substantially all of the assets or business." Without intimating or suggesting that we would have reached any different result upon application of the Maine statute to the same facts, it may be noted that in our statute the words "substantially all" refer only to "assets" and not to "business." *State* v. *Skyland Crafts*, 240 N. C. 727, 83 S. E. (2nd) 893, relied upon by the petitioner, is a case which involved interpretation of phraseology similar to that used in the Maine statute. For the purpose of ascertaining the meaning of particular words and phrases, it is of no consequence here that the North Carolina statute which was the subject of interpretation dealt with the situation covered by Paragraph B rather than by Paragraph C of the Maine statute. The facts closely resembled the facts before us. The buyer acquired from the seller machinery and raw material but did not acquire real estate, accounts receivable, customer lists, good will, or the right to use the trade name. Moreover, in Skyland the selling concern had been shut down for three months prior to transfer of ownership and in effect had gone out of active business. Although perhaps not determinative, this additional factor without doubt weighed in the balance, particularly in view of the court's interpretation of the statutory language. The court declined to assign any precise meaning to the phrase, "or substantially all of the assets thereof," but stated at page 896 of 83 S. E. (2nd): "Read in context, (the statute) contemplates a transaction in which the purchaser, instead of buying physical assets as such, succeeds in some real sense to the organization, trade

or business, * * * of a covered employer, ordinarily as a going concern. The underlying idea is that of continuity, the new employing unit succeeding to and continuing the business * * * of the former employing unit." The North Carolina court then held that the requisite continuity did not exist on the facts presented. Whether the court would have reached the same result in the absence of the "shut down" factor, we cannot say. In determining legislative intent with reference to the phrase, "substantially all of the assets thereof," we prefer to assign the literal meaning to the words employed in our own Act and test the facts accordingly. Such a literal meaning seems to have been applied in *State* v. *Lewis,* 218 S. W. (2nd) (Tex.) 515, where the court concluded that a buyer failed to acquire the "business" but became chargeable as an "employer" through purchase of substantially all the physical and tangible assets. Other decisions such as *State* v. *Whitehurst,* 231 N. C. 497, 57 S. E. (2nd) 770; *Spagnola* v. *State,* 23 N. W. (2nd) (Iowa) 433; *Sea Crest Hotel* v. *Dir. of Div. Emp. Sec.,* 330 Mass. 226, 112 N. E. (2nd) 813, seem to us readily distinguishable and require no comment.

Opposing contentions are made upon the issue as to whether the statute should be viewed as a taxing act and construed strictly against the taxing authority, or as a remedial statute to be liberally construed to effectuate legislative purpose. This question was left open in *Unemployment Com.* v. *Androscoggin et al.,* 137 Me. 154. We have no hesitation in holding that statutes such as our Maine Employment Security Law are remedial and must be liberally construed for the purpose of accomplishing their objectives—in this instance the stabilization of employment conditions and the amelioration of unemployment. *Cal. Emp. Stabilization Com'n* v. *Lewis,* 68 Cal. App. (2nd) 552, 157 P. (2nd) 38. But as was said in *Hattersley* v. *Div. of Emp. Sec.,* 19 N. J. 487, 117 A. (2nd) 607 at 609: "No mat-

ter how 'liberal' our construction, we must interpret the statute as it is written."

Having determined that findings that the petitioner either acquired the organization, trade or business of the Frost Estate, or acquired substantially all of the assets thereof, are not supported by evidence, the entry must be

*Exceptions sustained.*